UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| US CAPITAL GLOBAL INVESTMENT MANAGEMENT LLC, f/k/a US CAPITAL INVESTMENT MANAGEMENT, LLC, a limited liability company, and US CAPITAL PARTNERS INC., a corporation. | § § § § § § § § § § § § | |
| *Plaintiffs*, | § § | Civil Action No. 1:22-cv-626 |
| v. | § § § | |
| NOBLE CAPITAL GROUP, LLC, and NOBLE CAPITAL FUND MANAGEMENT, LLC. | § § § § § | |
| *Defendants,* | § | |

_____

### PLAINTIFFS' ORIGINAL COMPLAINT
_____

TO THE HONORABLE COURT:

Plaintiffs, US CAPITAL GLOBAL INVESTMENT MANAGEMENT, LLC and US CAPITAL PARTNERS, INC., by and through the undersigned counsel, file this Original Complaint against Defendants, NOBLE CAPITAL FUND MANAGEMENT, LLC and NOBLE CAPITAL GROUP, LLC, for damages of approximately One Hundred Million Dollars ($100,000,000.00).

### **Jurisdiction and Venue**

1.     This Court possesses supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to the claims asserted herein.

2.     Personal jurisdiction is proper as to Defendant Noble Capital Group because: (1) the members of Noble Capital Group are citizens of the State of Texas; (2) the controversy is related to and arises out of Noble Capital Group's contacts with the States of Texas and California; and (3) the assertion of personal jurisdiction comports with fair play and

substantial justice.

3.      Personal jurisdiction is proper as to Defendant Noble Capital Fund Management because: (1) the members of Noble Capital Fund Management are citizens of the State of Texas; (2) the controversy is related to and arises out of Noble Capital Fund Management's contacts with the States of Texas and California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

4.      Venue is proper in this jurisdiction pursuant to 28 U.S. Code § 1391 because Defendants primarily conduct their business in the Western District of Texas and engaged in many of the acts and omissions which gave rise to the Counts within this Complaint in the Western District of Texas.

### Parties

5.      Plaintiff, US Capital Global Investment Management, LLC f/k/a US Capital Global Investment Management, LLC ("USCGIM") is a California limited liability company with its principal place of business located in San Francisco, CA. None of the members of USCGIM are citizens of State of Texas.

6.      Plaintiff, US Capital Partners, Inc, (USCP, Inc.) is a California corporation with its principal place of business located in San Francisco, CA 94111. No shareholder of US Capital is a citizen of the State of Texas.

7.      Defendant Noble Capital Group is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas. Noble Capital Group is the parent entity to Noble Capital Fund Management.

8.      Defendant Noble Capital Fund Management ("NCFM"), is a limited liability

company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

## Substantive Allegations

### I.    Overview

9.    In 2016, USCGIM and USCP Inc. were introduced to the owners of the Noble Capital Group and its various multiple related entities. The Noble entities sought the expertise and credentials of USCGIM and its affiliated companies to create a private investment fund that resulted in the creation of the US Capital/Noble Capital Texas Real Estate Income Fund, LP (the "Fund").

10.    USCGIM agreed to become the general partner of US Capital/Noble Capital Texas Real Estate Income Fund, LP ("Fund"). NCFM is the Manager of the Fund, responsible for managing the investment performance of the Fund in return for an advisory fee to be paid by the Fund.

11.    NCFM''s management duties included originating Texas real estate investment opportunities, conducting due diligence of those opportunities, and managing the investment portfolio of the Fund for the Fund's best interest.

12.    In 2018, USCGIM caught the Defendants grossly mismanaging the Fund for the benefit of themselves.

13.    At that time, the Defendants intentionally and knowingly concocted and implemented a scheme of publishing defamatory accusations against the Plaintiffs and their affiliates and principals and officers, that are contrary to fact and the explicit language of the written contracts negotiated and executed by the Defendants with the Plaintiffs and the Fund.

14.     These lies were first used as threats in an attempt to coerce USCGIM to capitulate to the Defendants' demand to turn a blind eye to the Defendants mismanagement and provide them unfettered control of the investment Fund. USCGIM refused, and the Defendants have since filed and pursued various claims and counts within private arbitration proceedings, and the state and federal district courts of the State of Texas as a means to retaliate against the Plaintiffs, and to fabricate a pretext in a misguided attempt to justify to the Fund's investors the Defendants' malfeasance, mismanagement, poor performance and poor results.

15.     The knowingly false representations intentionally published repeatedly by the Defendants include the accusation that USCGIM and USCP Inc., and those associated with and/or acting on their behalf, "fraudulently induced" the Defendants to participate in the creation of the investment Fund and to sign written contracts with USCGIM, USCP Inc. and the Fund, with promises that USCGIM would produce a minimum amount of new investors to the Fund sufficient to raise as much as $250 million dollars. The Defendants have published and relied upon these false representations as the crux of every single legal action, defense, and claim for relief that they have pursued against USCGIM since January 2019.

16.     At all times, the Defendants have known that their representations are false. This is because at the inception of their business relationship with USCGIM, the Defendants and USCGIM signed a written contract with US Capital Global Securities, LLC , ("USCGS"), a registered broker-dealer, that is clear and unequivocal that USCGS is the Fund's only placement agent and that there is no obligation to raise any amount of investment capital or funds, or to contract with any new investors. The contract was negotiated by the Defendants who hold themselves out to the public and their own investors as sophisticated and

successful business persons; they negotiated and revised the contract with the advice and counsel of their attorneys; and they voluntarily signed and executed the contract, fully aware of the terms and conditions therein.

17.     Furthermore, Mr. Chris Ragland, a former member, and COO of NCFM and an officer/member of Noble Capital Group, was the primary negotiator on behalf of the Defendants of the USCGIM and Fund agreements. Ragland has admitted that during contract negotiations, he asked the Plaintiffs and USCGS to agree to a specific obligation to raise new investor funds/money and that the Plaintiffs rejected the proposal. Ragland has also admitted that he subsequently approved the contracts and the contracts were signed by the Defendants knowing that there was no such commitment or obligation for USCGIM.

## II.     Noble Caught Red-Handed and Its Motivation to Defame and Harm US Capital

18.     Noble Capital's business depends on its highly curated—and highly misleading—general public advertising practices. To obtain funds from investors, Noble misleads retiree and non-retiree investors in a number of ways. During the period of time relevant to this action, Noble Capital guaranteed, without any basis or caveat, that it could deliver above-market, 8.25% returns with no risk of loss. It falsely represented to investors that it had obtained credentials and regulatory clearances in its own name that it has not obtained. It freerode off of the name, credentials, and goodwill of entities like the US Capital entities, without proper attribution. It lied to investors about its extensive history of bankruptcies, claiming instead that it has not declared bankruptcy. And it lied to investors about its leverage, falsely claiming that it is entirely unleveraged.

19.     The Fund and Noble Capital's relationship is based on a series of contracts including a Management Advisory Services Agreement ("MASA") wherein Noble Capital

recruits limited partner investors into the Fund and then uses its suite of companies to recommend, originate, and manage real-estate loans for the Fund with the goal of earning interest income. Noble Capital's primary duties owed to the Fund include vetting borrowers, recommending sound loans to the Fund, originating loans that the Fund approves, acting as a loan servicer (*i.e.* collecting payments and forwarding them to the Fund and keeping books and records), and working out troubled loans.

20.     Noble however furnished false and misleading credit memoranda to the Fund to induce it to fund loans that Noble knew posed an unacceptable risk of default. These memoranda falsely represented that borrowers' credit and background reports "came back clear," when in reality, certain borrowers had multiple foreclosures, while others were already in default to other Noble-controlled entities.

21.     For example, on April 25, 2017, Defendants sent a credit memorandum to the Fund signed by Ragland recommending that the Fund finance a loan to FDI Divine Property Group, LLC ("FDI"). According to the credit memorandum, Noble ran background reports for FDI's owners that "came back clear." But in reality, the manager of FDI, who signed for the note, had three foreclosures in the ten-year period leading up to this promissory note, the most recent of which was recorded in March 2016. Even worse, Noble Capital had actually entered into this loan in July 2016, a mere four months after that recent foreclosure. Thus, by the time the Fund was brought into the transaction, Noble had been dealing with FDI and its owners for nine months. Soon after the Fund stepped in, FDI defaulted on the loan, causing the Fund losses.

22.     Similarly, on April 20, 2017, Defendants sent a credit memorandum signed by Ragland and Grady Collins to the Fund recommending that it fund a loan to Northshore

Homes. As with the previous loan, the credit memorandum stated that all background checks "came back clear." But a title, lien, and registration report on Northshore Homes reveals that it has had 17 foreclosures and 18 judgments entered against it. On information and belief, many or all of those predated the loan that Noble Capital recommended. Furthermore, as with other bad loans, Noble Capital had actually entered into this loan seven months before it recommended it to the Fund. Accordingly, Noble knew or recklessly disregarded the fact that it would go into default, which is exactly what happened.

23.     As a final example, on September 25, 2017, Defendants sent a credit memorandum to the Fund recommending that it fund a loan to Loved Homes of Austin, LLC ("Loved Homes"). The credit memorandum was issued in support of the transaction and noted that all background checks "came back clear." As with the loans to FDI and Northshore Homes, Noble Capital had actually entered into the loan with Loved Homes much earlier, on October 26, 2016, eleven months before it recommended the loan to the Fund. Remarkably, Noble Capital itself caused a notice of default to be filed on behalf of James Wiggins against Loved Homes just *three months* before it recommended that the Fund step in with funding. As with the other bad loans, Loved Homes quickly defaulted.

24.     To make matters worse, Defendants misled the Fund into believing that Noble Capital had tightened its diligence process to ensure that borrowers had appropriate experience and credentials, among other things.  Ragland described these "credentials" in a video for the general investing public as follows: "If they don't know what they're doing, if hey haven't done it before, there's no reason we should give them a loan and let them try it out on us. So if they don't have experience or credentials, not gonna happen." *See* https://www.youtube.com/watch?v =a36wkjzTr0A (last accessed May 17, 2019 at 2:57

p.m.). Borrowers with lengthy foreclosure histories or very recent defaults very obviously do not have "credentials."

25.     As a result of Defendants' fraudulent credit memoranda and intentional diligence failures, 13% of the loans that Defendants originated for the Fund (representing 17% of the Fund's assets) defaulted. Many of the defaults were "early payment defaults," which occurs when loans are so risky that the borrower defaults without ever making a single payment.

26.     Part of Defendants' overarching plan was to defraud the Fund into taking on bad debt from other Noble-controlled entities. This served Defendants' unlawful enterprise scheme because it allowed Defendants to conceal losses in other Noble subsidiaries by transferring them to the Fund. The Fund is informed and believes, and on that basis alleges, that shifting bad loans among their various entities was Defendants' *modus operandi* dating back nearly a decade, and it has enabled them to extract additional money from their scheme from a wider pool of individuals over a lengthy timeframe.

27.     For example, upon information and belief, Noble Capital recommended a borrower who previously had numerous foreclosures entered against him. His loans through Noble went into foreclosure, which caused losses. Yet Noble profited—in addition to the substantial origination and servicing fees it obtained on the front end, most of the renovation work on the subject properties had been completed at the time of default, which resulted in a windfall for Defendants on the back end. Making matters worse, the borrower on that loan has publicly stated that Defendants forced this property into foreclosure by wrongfully denying a final draw on his loans, to cause a default.

28.     When the USCSIM as the Fund's General Partner brought Noble's unacceptably

high-default rate to their attention in Q2 2018, Noble agreed to purchase the defaulted loans from the Fund. As described more fully *infra* this led to a separate set of wrongful conduct by Defendants that damaged the Fund.

29.     In addition to the defaults already described, Noble Capital purchased a further set of defaulted loans in Q3 and Q4 2018. These loans amounted to approximately 5% of all loans Noble originated for the Fund.

30.     Just like the initial set of bad loans, some of these were early payment defaults. The Fund has been forced to seek out a third-party servicer for collections and workouts for these additional loans.

31.     Noble kept the substantial loan origination fees generated by these loans. On information and belief, Noble also pocketed substantial gains from foreclosing on the properties that secured the defaulted loans through their companies Noble Capital Real Estate and Noble Capital REO, and indeed, have converted many of these properties for their own gain, as set forth further below.

32.     Noble did this by entering into loans that posed an unacceptable degree of risk so that they could generate origination and servicing fees on the front end, and work-out fees and other REO-related windfalls on the back end, all while attempting to conceal the losses that they were incurring from the Fund and its investors.

33.     Defendants were motivated to transact with the Fund to obtain certain certifications and credentials that the Fund – but not Defendants – had the qualifications and wherewithal to obtain. Defendants used these valuable credentials to mislead investors into thinking that Noble entities had gone through third-party diligence and audit processes, and received certifications and approvals, that they had not gone through or obtained.

34.     Defendants were further motivated to transact with the Fund to increase their amount of funds under management (which they generate proportional fees from), to establish essentially a $24,000,000 revolving line of credit through the Fund's assets under management, to be able to draw on that credit to fund loans without having to cobble together a group of individual investors (which was Noble's pre-Fund practice), to access the lending market for deals larger than $500,000 (which Noble was unable to consistently access prior to its partnership with the Fund), and to freeride off of the fact that the Fund is audited annually by a neutral third-party (which high-net-worth investors understand and care about).

35.     As a result, 13% of the loans that Noble sourced for the Fund (representing 17% of the Fund's total assets) defaulted, casting a cloud over millions of dollars in Fund assets. That is no coincidence; Defendants' overarching plan was to shift losses from other Noble-controlled entities to the Fund through the fraud described above, while concealing the underlying facts from the Fund.

36.     To that end, Noble refused to provide the Fund's independent auditor with access and documents requested in an attempt to hide its misdeeds and falsely claimed that it does not have the capability to produce monthly loan statements for any particular loan. In May 2019, it also ceased forwarding any principal or interest payments on the loans in the Fund's portfolio and as a result, has wrongfully commandeered millions of dollars of assets that it has no entitlement to.

37.     This pattern of fraud has resulted in losses for the Fund while simultaneously resulting in gains for the Noble Capital enterprise.

38.     The Fund's substantial losses were compounded by the fact that Noble Capital

promised the Fund's investors above-market, 8.25% returns, which the Fund was unable to deliver. This too harmed the Fund while advantaging Noble Capital, because Noble Capital used the Fund's underperformance to besmirch the Fund and divert its investors into other Noble-controlled funds.

III.     **Noble's Retaliatory Abuse of Judicial Processes and Malicious Prosecution Based Upon Defamatory False Representations**.

39.     At the end of 2018, USCGIM confronted Noble regarding its abuse of the Fund's assets and investments. Noble retaliated and insisted that USCGIM remove itself as the Fund's General Partner, or prepare to spend thousands of dollars, and devote countless hours of time and distraction from business, defending itself against claims based on false representations "fraud" and "fraudulent inducement" which are contrary to fact and the Defendants' own contracts.

40.     To that end and based on these false representations, NCFM, and two "feeder funds" which are organized as limited liability companies managed and controlled by the Defendants, filed a JAMS arbitration proceeding against USCGIM in January 2019. The Fund later joined the arbitration to pursue its own claims against the Noble entities, principals, and officers.

41.     Thereafter, in September 2019, without notice of consent to USCGIM, the Fund's General Partner, Noble Capital unlawfully raided and caused the transfer of all of the Fund's assets (over $26 million, including more than $2 million in interest income), away from the Fund into other investment vehicles solely owned and controlled by the Defendants, without any notice to the Fund, without any right to do so, and in contradiction of the LPA and MASA.

42.     Noble's conversion of the Fund's assets occurred on the eve of the September

19, 2019, arbitration hearing on a preliminary injunction motion against the Noble parties. The hearing proceeded and the JAMS arbitration panel rendered a Partial Final Award dated September 27, 2019. The Partial Final Award contains the following, " ...the Panel finds that the recent liquidation of the Fund by Noble Capital establishes that the Fund will likely prevail at trial on its Breach of Contract and Conversion causes of action."

43.     On December 27, 2019 Noble Capital Group, LLC and Noble Capital Fund Management, LLC filed a Complaint in Case No. 1:19-cv-01255; *Noble Capital Group LLC, et al. v. US Capital Partners, Inc., et al.*, Western District of Texas, Austin Division. USCP INC., filed a Motion to Compel Arbitration and on February 19, 2020, and the Noble entities filed a First Amended Complaint in an effort to avoid the arbitration clauses in their written agreements, with new, but also intentionally false representations, of being fraudulently induced into signing the agreements that were prepared with the assistance of their own lawyers and they read and understood before singing.

44.     Noble's amended pleading falsely called USCP Inc. a "fraudster", and continued to rely on the intentionally false representations that Noble and the Fund investors were harmed by USCP Inc.'s "repeated misrepresentations about their ability to raise capital and investment fund[s] with the purpose of inducing Noble to place millions of investment dollars with US Capital". According to Noble's public pleading, "[t]he fraud worked; it resulted in the creation of..the Fund, which was funded entirely with investor capital sourced by Noble."  Noble's public allegations rely specifically on pre-contract "proposals" between Noble and USCP Inc., - most of which are untrue- and intentionally ignores the reality that no contract Noble signed with USCP, Inc., or USCGIM, or any US Capital related entity, contains any obligation for any US Capital entity to raise any capital and/or investment funds." Noble's

publication also ignores the fact that its own Operations Partner, Chris Ragland was at all times aware that the US Capital entities rejected the proposal that they would be required to raise any specific amount of capital or investment funds, and that Ragland authorized Noble to sign the agreements with the US Capital entities without any such obligation.

45.    In fact, pursuant to the February 2017 written agreement between Noble and USCGM, USCGIM, made "no representations, or warranties about Issuer's ability to successfully effect a financing or other transaction", and that it is expressly "understood that nothing contained in this Agreement shall constitute an express or implied commitment by [US Capital] to act in any capacity or to underwrite, place or purchase any financing or securities."

46.    Noble also ignored the extraordinary efforts made by the USCGIM to market the investment opportunities of the Fund to potential new investors, that included nationwide and international solicitations, and in-person sales presentations in California, New York and Texas, some of which Noble actually participated in.

47.    Noble also filed this suit knowing that the same claims were previously submitted by Noble itself to private arbitration as required by the express language of the LPA. Noble's true intention was not to re-litigate these claims in the federal district court, but to use the filing process as a means to publicly defame US Capital.

48.    To this end, Noble also intentionally attached to its pleading an exhibit from the arbitration which it knew was to remain confidential from public disclosure as required by the express terms of its contracts with all US Capital entities.  The operative agreement between US Capital Inc. and NCFM is clear that the only a "final award" regarding any dispute between the parties is not to be kept and maintained confidential. Noble, however,

intentionally breached the agreement when it attached to its district court complaint and published a copy of an "Emergency Arbitrator's Award", which contained only "interim" or temporary findings.   Noble later conceded that the document should have been kept confidential and agreed to seal its Complaint from public view.

49.     The US Capital entities filed a second Motion to Compel Arbitration and Stay Proceedings, or Alternatively Motion to Dismiss, which was granted on July 31, 2020 by the Honorable Lee Yeakel, United States District Judge.

50.     In the meantime, Noble abandoned the JAMS arbitration and the arbitration was terminated on August 29, 2020, after Noble failed to pay JAMS' fees and costs necessary to maintain its claims against USCGIM.

51.     In the federal case where Noble unsuccessfully sought to avoid its contractual arbitration obligations, Noble appealed the to the United States Court of Appeals for the Fifth Circuit, Case No. 20-50721, and on August 6, 2021 the appellate court affirmed the district court's order. On August 30, 2021 the Fifth Circuit issued its mandate in the case.

52.     Thus, Noble's intent and effort to publicize its false representations of fraud and fraudulent inducement against USCGIM and US Capital, in spite of the confidential arbitration obligations were thwarted.

53.     Undeterred because Noble continues to need to use USCGIM and US Capital Inc., as a red-hearing scapegoat to justify to its investors Noble's lack of investment performance, Noble filed yet another public lawsuit. For instance, NCFM admits in is latest suit, that its clients, including limited partners of the Fund "are complaining about the management of the investment, and some have cut ties with Noble." See, para. 36, NCFM Petition, *Noble Capital Fund Management, LLC, TXPLCFQ,LLC, TXLCFNQ, LLC v. US Capital*

*Global Investment Management, LLC,* Case No.: 20-cv-1247 (USDC West. Dst. Texas).

54.     In November 2020, NCFM and the two feeder funds filed a civil complaint in Travis County, Texas State Court against USCGIM based upon the same false representations of fraud and fraudulent inducement as were pled against USCGIM in the original JAMS arbitration, and against US Capital in the Texas federal district court case which was dismissed because the Defendants failed to arbitrate those claims. USCGIM removed the case to this federal district court. See, *Noble Capital Fund Management, LLC, TXPLCFQ,LLC, TXLCFNQ, LLC v. US Capital Global Investment Management, LLC,* Case No.: 20-cv-1247 (USDC West. Dst. Texas).

55.     The relationship between NCFM and USCGIM is governed by a contract, the Management Advisory Services Agreement ("MASA"), also negotiated with the assistance of NCFM's attorneys, that includes a requirement that arbitration documents remain confidential with the lone exception of a "final" award.

56.     Knowing this obligation, NCFM also again intentionally violated the confidentiality provision of its contract with USCGIM when it publicly filed a non-final arbitration award with its latest Complaint. The purpose of doing so is to continue to defame, damage and harass USCGIM, and all related US Capital entities and individuals, in an effort to justify to its investors Nobles own investment management fraud, and failed promises of performance.

57.     NCFM's intentional efforts to publicly harm USCGIM and justify its own misconduct continued in the Texas federal district court when it filed and sought a preliminary junction against USGIM which had no merit whatsoever. The district court denied NCFM's motion after affording NCFM a full blown evidentiary hearing to present any

evidence it cold muster to support its allegations that USCGIM had "irreparably" harmed it. The Court denied USCGIM's motion because of the complete lack of any such evidence.

## IV.    Causes of Action

**Cause 1.       Malicious Prosecution: US Capital Partners, Inc., against both Defendants**

58.      US Capital Partners, Inc., adopts and incorporates the allegations in paragraphs 1-57 & 90 as if fully realleged herein.

59.      The Defendants, Noble Capital Group LLC and Noble Capital Fund Management, LLC lacked probable cause to file, initiate, bring and pursue the lawsuit against US Capital Partners, Inc., styled as *Noble Capital Group LLC, and Noble Capital Fund Management, LLC, v. US Capital Partners, Inc., Jeffery Sweeney, Charles Towle, and Patrick Steele*, (US DC Western Dist. Of Texas, Case No.: 19-cv-01255).

60.      The Defendants filed and pursued the lawsuit with malice and for the malicious purpose of retaliating against USCGIM for its failure to capitulate to the Defendants' demands to remove itself as the Fund's General Partner and provide the Defendants unfettered control of the investment Fund, and to fabricate a pretext in a misguided attempt to justify to the Fund's investors the Defendants' malfeasance, mismanagement, poor performance and poor results.

61.      US Capital Partners, Inc., prevailed, i.e., won the lawsuit.

62.      US Capital Partners, Inc., has been damaged by the malicious lawsuit prosecuted by the Defendants by damage to its business reputation, loss of business opportunities, monetary damages including potentially millions of dollars in profit, the incurrence of attorney's fees and litigation related costs, and the distraction from the usual and routine functions of operating their business. US Capital Partners, Inc., demands

judgment against Noble Capital Group, LLC and Noble Capital Fund Management, and an award of all legal and equitable to relief to which it is entitled, including attorney's fees and litigation costs as special damages and punitive damages.

**Cause 2.**      **Abuse of Process: US Capital Partners, Inc., against both Defendants**

63.      US Capital Partners, Inc., adopts and incorporates the allegations in paragraphs 1-57 & 90 as if fully realleged herein.

64.      The Defendants filed, served process upon, and pursued the lawsuit against US Capital Partners, Inc., styled as *Noble Capital Group LLC, and Noble Capital Fund Management, LLC, v. US Capital Partners, Inc., Jeffery Sweeney, Charles Towle, and Patrick Steele*, (US DC Western Dist. Of Texas, Case No.: 19-cv-01255).

65.      The Defendants intentionally used this legal procedure for the improper purpose of. The Defendants filed and pursued the lawsuit with malice and for the malicious purpose of retaliating against USCGIM for its failure to capitulate to the Defendants' demands to remove itself as the Fund's General Partner and provide the Defendants unfettered control of the investment Fund, and to fabricate a pretext in a misguided attempt to justify to the Fund's investors the Defendants' malfeasance, mismanagement, poor performance and poor results, that the legal procedure was not designed to achieve

66.      US Capital Partners, Inc. was harmed.

67.      The Defendants' conduct was a substantial factor in the harm caused to US Capital Partners, Inc., and US Capital Partners, Inc., demands judgment against Noble Capital Group, LLC and Noble Capital Fund Management, and an award of all legal and equitable to relief to which it is entitled, including attorney's fees and litigation costs as special damages and punitive damages.

**Cause 3.**      **Abuse of Process: US Capital Global Investment Management, LLC against Noble Capital Fund Management LLC**

68.      USCGIM adopts and incorporates the allegations in paragraphs 1-57 & 90 as if fully realleged herein.

69.      Noble Capital Fund Management, LLC filed a Complaint in Travis County Texas state court seeking preliminary injunctive relief. The action was removed to this federal district court, and is styled as *Noble Capital Fund Management, LLC, TXPLCFQ,LLC, TXLCFNQ, LLC v. US Capital Global Investment Management, LLC,* Case No.: 20-cv-1247 (US DC West. Dst. Texas).

70.      On January 13, 2021, NCFM filed a motion for preliminary injunction against USCGIM, and supported the motion with a declaration from Chris Ragland. Ragland's declaration swore under oath that: (1) USCGIM had two tasks with respect to the Fund: raise capital and ensure regulatory compliance; (2) "From the outset, USCGIM wholly failed at its task of raising investment dollars", (3) "[w]"hen the Fund was set ups, USCGIM represented that after Noble brought initial investors in, USCGIM would follow through with "significant" institutional investments. USCGIM projected a total capital raise of a quarter of a billion dollars."; (4) that the "feeder funds placed investments in the Fund in reliance on these representations"; and that, (5) USCGIM representations amounted to "fraudulent conduct". See, *Case No.: 20-cv-1247, D.E. 5, and D.E.5-1.*

71.      Ragland swore to these statements under penalty of perjury knowing that during the contract negotiations that he conducted on behalf of NCFM, USCGIM rejected his proposal that USCGIM, or any other US Capital related entity, would be required or committed to raise any amount of capital or investment from any source, including institutional investors. Ragland was also aware that all contracts between USCGIM, and any

US Capital entity, and Noble Capital Group, LLC, NCGFM, and the Fund, contain explicit language that any previous representations which is not memorialized and included in the contact could not be relied upon and that the contracts cannot be amended .

72.     On January 21, 2021, the Court denied NCFM's motion.

73.     The Defendants intentionally used this legal procedure for the improper purpose of maliciously retaliating against USCGIM for refusing the Defendants' demands to remove itself as the Fund's General Partner and provide the Defendants unfettered control of the investment Fund, and to fabricate a pretext in a misguided attempt to justify to the Fund's investors the Defendants' malfeasance, mismanagement, poor performance and poor results, that the legal procedure was not designed to achieve.

74.     USCGIM, was harmed.

75.     The Defendants' conduct was a substantial factor in the harm caused to USCGIM, and USCGIM demands judgment against Noble Capital Fund Management, LLC and an award of all legal and equitable to relief to which it is entitled, including attorney's fees and litigation costs as special damages and punitive damages.

**Cause 4.**     **Breach of Contract: US Capital Global Investment Management, LLC against Noble Capital Fund Management LLC**

76.     USCGIM adopts and incorporates the allegations in paragraphs 1-57 & 90 as if fully realleged herein.

77.     USCGIM and NCFM voluntarily entered into a contact, known as the MASA.

78.     NCFM intentionally breached the MASA when it published a non-final arbitration award with the Complaint that it filed in the case currently styled as, *Noble Capital Fund Management, LLC, TXPLCFQ,LLC, TXLCFNQ, LLC v. US Capital Global Investment Management, LLC,* Case No.: 20-cv-1247 (US DC West. Dst. Texas).

79.     USCGIM has been harmed by MCFM's breach and USCGIM seeks judgment against Noble Capital Fund Management LLC, and an award of all legal and equitable to relief to which it is entitled, including attorney's fees and litigation costs as special damages.

**Cause 5.**     **<u>Breach of Contract: US Capital Partners, Inc., against Noble Capital Fund Management LLC</u>**

80.     US Capital Partners, Inc. adopts and incorporates the allegations in paragraphs 1-57 & 90 as if fully realleged herein.

81.     US Capital Partners, Inc. NCFM voluntarily entered into a contact, known as the Letter Agreement of August 16, 2016. NCFM intentionally breached the Letter Agreement when it published a non-final arbitration award with the Complaint that it filed in the case styled as, styled as *Noble Capital Group LLC, and Noble Capital Fund Management, LLC, v. US Capital Partners, Inc., Jeffery Sweeney, Charles Towle, and Patrick Steele*, (US DC Western Dist. Of Texas, Case No.: 19-cv-01255).

82.     US Capital Partners, Inc. has been harmed by MCFM's breach.

83.     USCGIM seeks judgment against Noble Capital Fund Management, LLC, and an award of all legal and equitable to relief to which it is entitled, including attorney's fees and litigation costs as special damages.

**Cause 6.**     **<u>Breach of Contract: Noble Capital Fund Management LLC is Obligated to Indemnify US Capital Partners, Inc.</u>**

84.     US Capital Partners, Inc. adopts and incorporates the allegations in paragraphs 1-57 & 90 as if fully realleged herein.

85.     Pursuant to paragraph 7: "Indemnification: Limitation of Liability" within the August 8, 2016, Letter Agreement between US Capital Partners, Inc.., and Noble Capital Fund Management, LLC, NCFM owes a duty to indemnify and hold harmless US Capital Partners

Inc., from and against any losses, claims, damages or liabilities, and to reimburse all documented out-of-pocket expenses, including fees, charges and disbursements to counsel, that are related to, or arising out of or in connection with US Capital Partners Inc.'s engagement.

86.   NCFM therefore owes USCP reimbursement and payment of all costs and expenses, damages, and liabilities, including attorney's fees incurred or charged to and/or incurred by US Capital Partners, Inc., in relation to the action styled as *Noble Capital Group LLC, and Noble Capital Fund Management, LLC, v. US Capital Partners, Inc., Jeffery Sweeney, Charles Towle, and Patrick Steele*, (US DC Western Dist. Of Texas, Case No.: 19-cv-01255).

87.   NCFM has denied indemnification, and therefore breached the agreement which has caused harm to US Capital Partners, Inc. US Capital Partners, Inc. demands judgment against Noble Capital Fund Management, LLC for Breach of contract, and an award of all legal and equitable to relief to which it is entitled, including indemnification as agreed to within the parties' Letter Agreement of August 8, 2016.

**Cause 7.**   **Breach of Contract: Noble Capital Fund Management LLC is Obligated to Indemnify US Capital Global Investment Management, LLC**

88.   US Capital Global Investment Management, LLC adopts and incorporates the allegations in paragraphs 1-57 & 90 as if fully realleged herein.

89.   Pursuant to paragraph 5: "Indemnification: Limitation of Liability" within the August 8, 2016, Letter Agreement between US Capital Global Investment Management, LLC and Noble Capital Fund Management, LLC, NCFM owes a duty to indemnify and hold harmless USCGIM, from and against, and pay or reimburse USCGIM from any losses, claims, damages or liabilities,(whether or not resulting from third party claims), including fees,

charges and disbursements to counsel, that are related to, or in any manner arising out of the performance of USCGIM of its services under the Agreement.

90.   NCFM therefore owes USCGIM reimbursement and payment of all costs and expenses, damages, and liabilities, including attorney's fees incurred or charged to and/or incurred by USCGIM., in relation to the action styled as styled as *Noble Capital Fund Management, LLC, TXPLCFQ,LLC, TXLCFNQ, LLC v. US Capital Global Investment Management, LLC,* Case No.: 20-cv-1247 (US DC West. Dst. Texas). NCFM has denied indemnification, and therefore breached the agreement which has caused harm to USCGIM. US Capital Global Investment Management, LLC Inc. seeks judgment against Noble Capital Fund Management, LLC for Breach of Contract, and an award of all legal and equitable to relief to which it is entitled, including indemnification as agreed to within the parties' Management Services Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, US CAPITAL GLOBAL INVESTMENMT LLC demands the following relief:

A.   Enter judgment in favor of US Capital Global Investment, LLC against Noble  Capital Fund Management, LLC on each of the causes of action against it (Cause 3: Abuse of Process; Cause 4: Breach of Contract; and Cause 7: Indemnification);

B.   Award US Capital Global Investment Management, LLC all compensatory damages, special damages, lost profits, and/or reimbursement, and restitution, in an amount totaling approximately $100 Million dollars, otherwise to be proven at trial, to be paid by Noble Capital Fund Management, LLC;

C.      Enter judgment in favor of US Capital Partners, Inc., against Noble Capital Fund Management, LLC on each of the causes of action against it (Count 1: Malicious Prosecution; Count 2: Abuse of Process; Count 5: Breach of Contract; and Count 6 Indemnification);

D.      Award US Capital Partners, Inc. all compensatory damages, special damages, lost profits, and/or reimbursement, and restitution, in an amount totaling approximately $100 Million dollars, otherwise to be proven at trial, to be paid by Noble Capital Fund Management, LLC;

E.      Enter judgment in favor of US Capital Partners, Inc., against Noble Capital Group, LLC on each of the causes of action against it (Count 1: Malicious Prosecution; and Count 2: Abuse of Process);

F.      Award US Capital Partners, Inc. all compensatory damages, special damages, lost profits, and/or reimbursement, and restitution in an amount totaling approximately $100 Million dollars, otherwise to be proven at trial, to be paid by Noble Capital Group, LLC;

G.      Award each of the US Capital parties punitive, treble, and/or exemplary damages for all claims for which such damages are authorized; and

H.      Order pre-and post-judgment interest for each of the US Capital parties at the maximum rate as provided by law.

[Signature on following page]

Dated: <u>June 28, 2022</u>          Respectfully submitted,

                              **THE WOODALL LAW FIRM, PLLC**

                              1725 Hughes Landing Boulevard, Suite 1250
                              The Woodlands, Texas 77380
                              Telephone:     281/892-1040
                              Facsimile:     281/305-3892

          By:    <u>*/s/* J. Daniel Woodall</u>
                              J. Daniel Woodall
                              Attorney in Charge
                              Tx Bar No. 24008300
                              SDTX Bar No. 31915
                              Mobile: 832-724-6351
                              dan@woodalllawfirm.com
                              *Counsel for Plaintiffs*